Jennifer L. Hess
RIEMER HESS LLC
Attorneys for Plaintiff
275 Madison Avenue, 26th Floor
New York, New York 10016
(212) 297-0700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM RHODES,<br><br>                         Plaintiff,<br><br>          -against-<br><br>FIRST RELIANCE STANDARD LIFE<br>INSURANCE COMPANY,<br><br>                         Defendant. | Index No. 1:22-cv-05264<br><br>**COMPLAINT**<br><br>ECF CASE |

Plaintiff William Rhodes, by his attorneys Riemer Hess LLC, complaining of unlawful conduct by Defendant First Reliance Standard Life Insurance Company ("First Reliance"), alleges:

1.     This is an action for benefits arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, et seq. and to recover prejudgment interest, attorneys' fees, and costs.

2.     This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3.     Venue is properly in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the breaches took place in this District and Defendant resides in or may be found in this District.

4.     First Reliance is licensed in New York and has its headquarters in New York.  First Reliance is also known by the corporate brand name Reliance Standard.

## MR. RHODES' PARTICIPATION IN THE
## GROUP LONG TERM DISABILITY PLAN

5.      Mr. Rhodes is a highly accomplished, 58-year-old man who last worked as the Head of Financial Engineering at MUFG Union Bank, N.A. ("Union Bank") – a leading, full-service bank with approximately 400 branches.

6.      At all relevant times, Mr. Rhodes was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in Union Bank's group long term disability insurance plan under Policy Number LTD 130291, which was underwritten by First Reliance (the "LTD Plan").

7.      At all relevant times, First Reliance is and has been the claims administrator of the LTD Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

8.      At all relevant times, First Reliance has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

9.      At all relevant times, the LTD Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

10.      The LTD Plan defines "Total Disability" or "Totally Disabled" in pertinent part as follows: (1) "[D]uring the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation"; and (2) "after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis."

11.      The LTD Plan defines "Regular Occupation" as follows:

"Regular Occupation" means the occupation the Insured is routinely performing when Total Disability begins.  We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale.

12.     The LTD Plan defines the Maximum Benefit Period for Total Disability for claimants under age 61 as to the Normal Retirement Age, as designated by the Social Security Administration.

13.     Mr. Rhodes' Normal Retirement Age, designated by the Social Security Administration, is 67.

## THE STANDARD OF REVIEW

14.     The LTD Plan does not contain language sufficient to grant First Reliance discretionary authority to determine eligibility for benefits or to interpret the terms therein.

15.     Even if the LTD Plan contains language granting First Reliance discretionary authority to determine eligibility for benefits or to interpret the terms therein, First Reliance forfeited its discretion.

16.     During the claims and administrative review processes, First Reliance failed to comply with the Department of Labor's claims procedure regulations, and its failure to comply was neither inadvertent nor harmless.

17.     Upon information and belief, First Reliance has not adopted claim procedures in accordance with the U.S. Department of Labor regulations.

18.     For these reasons, this case is subject to a *de novo* review.

## MR. RHODES' REGULAR OCCUPATION

19.     Mr. Rhodes last worked as the Head of Financial Engineering for Union Bank.

20.     Mr. Rhodes' Regular Occupation is as the Head of Financial Engineering for a major financial institution (hereinafter the "Occupation").

21.     First Reliance incorrectly identified Mr. Rhodes' Occupation as the Head of MBS Technology and Analytics – a position that he previously held at Union Bank.

22.     Mr. Rhodes' Occupation as Head of Financial Engineering is highly demanding and stressful.

23.    The duties of the Occupation include: (a) the development and maintenance of trading systems, electronic trading algorithms, quantitative models and analysis tools for Credit, Interest Rate Derivatives, and U.S. Treasury and Mortgage Trading businesses; (b) the implementation of tools and methodologies for risk management and stress testing of the firm's portfolio across these businesses; (c) support for daily trading activities such as trade capture, portfolio management, electronic trading, and P&L generation; (d) development of trading systems, pricing algorithms, financial models, and risk exposure reporting to support mortgage backed securities trading and securitization; (e) implementation prepayment projection model utilizing machine learning and big data methodologies; (f) leverage of interest rate forecasting models to perform Monte Carlo simulations for calculating option adjust spread; (g) provision of risk management tools to monitor the firm's risk exposure as required by the federal reserve; (h) implementation of large scale, distributed computer grid to support calculating risk exposure and portfolio stress testing; (i) provision of tools and support for calculating VAR (value at risk) and work with the model validation group to ensure the accuracy of these models; (j) participation in internal audits and federal reserve audits of trading businesses; (k) support for nightly risk batch; (l) implementation of electronic trading of interest derivatives, mortgage backed securities, and US Treasury securities; and (m) support for real-time price publication, RFQ (request for quote), auto negotiation, straight through processing, and auto hedging.

24.    The duties of the Occupation also include project management, with responsibilities such as (i) writing project proposals and business justification to obtain funding for new multi-year initiatives; (ii) defining project plans, timelines, and milestones, resource requirements including staffing, computer hardware and project budget, business requirements, and technical design; (iii) working with intellectual property lawyers to negotiate contracts with 3rd party vendors; (iv) managing relationships with 3rd party vendors as well as manage cross-functional teams consisting of representatives from trading, sales, risk management, operations, finance controllers, financial

engineering, and technology as well as legal and compliance departments; (v) chairing cross functional team meetings and provide project updates and status to senior management; (vi) managing all aspects of the software development life cycle from design, implementation, model validation/regression testing, code review, and user acceptance testing; and (vii) interviewing and hiring developers and financial engineers.

25.    Subpar performance is unacceptable in Mr. Rhodes' Occupation because even the slightest delay, oversight, or error could be disastrous.

26.    The Occupation cannot be performed within a predictable, nine-to-five schedule.

27.    The Occupation requires the employee to work long and unpredictable hours – often extending late into the night and/or on weekends.

28.    The Occupation requires the performance of time-sensitive tasks completed on demand to meet the expectations of the employee's employer and/or its customers.

29.    The Occupation requires the employee to focus on computer screens at desk level for prolonged periods while reviewing, analyzing, and processing complex information with a high level of precision and accuracy.

30.    The cognitive demands of the Occupation are exceptionally high for the employee, requiring analytical thinking, sustained attention/concentration, complex planning, attention to detail, and "thinking on their feet."

31.    The Occupation requires the employee to work efficiently and remain on task for extended durations to solve complicated problems under high-pressure conditions.

32.    The Occupation requires the employee to prioritize multiple tasks and coordinate efforts while working in groups and directing others.

33.    The Occupation requires the employee to lead teams, requiring clear and efficient communication with other professionals and employees of the employer.

34.     The Occupation also requires constant use of the employee's upper extremities for typing, using a mouse, using a phone, handling documents, and other computer and desk work.

35.     In particular, the Occupation requires the ability to type accurately and efficiently for prolonged periods of time.

## MR. RHODES' TRAUMATIC BRAIN INJURY AND DISABILITY

36.     Mr. Rhodes' career was cut short on March 27, 2019, after falling and suffering a traumatic brain injury in New York City's Grand Central Station several days earlier.

37.     Since March 27, 2019, Mr. Rhodes' head injury resulted in post-concussive syndrome, which causes him to experience cognitive deficits, including: slowed processing speed; psychomotor slowing; slow reading speed; poor reading comprehension; reduced math and executive skills; and poor attention/concentration.

38.     Since March 27, 2019, Mr. Rhodes also experiences physical symptoms as a result of his head injury, including: headache; fatigue; dizziness; noise and light sensitivity; balance impairment; deficient fine motor coordination in his right hand; and visual disturbances.

39.     Effective March 27, 2019, Mr. Rhodes' symptoms rendered him incapable of meeting the demands of his Occupation.

40.     Mr. Rhodes has not worked in any capacity since March 27, 2019.

41.     To date, Mr. Rhodes' inability to perform his Occupation for an employer is well-supported by the medical and vocational evidence that he submitted in support of his claim.

42.     To date, Mr. Rhodes' inability to perform his or any other reasonable occupation is also well-supported by the medical and vocational evidence that he submitted in support of his claim.

43.     Mr. Rhodes' treatment has been under the appropriate care of medical professionals specializing in his conditions.

44.     Despite treatment, Mr. Rhodes' physical symptoms have not significantly improved to

6

the degree that he could perform his Occupation or any other reasonable occupation since March 27, 2019.

45.    Despite treatment, Mr. Rhodes' cognitive symptoms have not significantly improved to the degree that he could perform his Occupation or any other reasonable occupation since March 27, 2019.

46.    Mr. Rhodes' inability to perform the demands of his Occupation or any other reasonable occupation from March 27, 2019 through present is corroborated and supported by objective medical evidence, including abnormal diagnostic testing, the results of multiple neuropsychological evaluations, and clinical findings upon examination, together with the unanimous opinions of his treating providers and the fully favorable determination of Social Security Administration Administrative Law Judge ("ALJ") Thurman Anderson, (approving Mr. Rhodes' claim for Social Security Disability Insurance benefits effective March 27, 2019).

<u>The Abnormal Diagnostic Testing</u>

47.    The most recent MRI of the brain, performed on December 2, 2019, showed objective areas of microstructural abnormality in the pons bilaterally.

48.    Diagnostic imaging of Mr. Rhodes' brain in the months immediately following his accident also revealed objective abnormalities.

<u>The Two Abnormal Neuropsychological Evaluations</u>

49.    A neuropsychological evaluation is widely accepted as the gold standard for objectively measuring a cognitive impairment.

50.    Mr. Rhodes underwent <u>two</u> neuropsychological evaluations that revealed significant abnormalities and functional deficits.

51.    An independent neuropsychological medical examiner, Karen L. Dahlman, Ph.D. ("IME Dr. Dahlman"), conducted a thorough, in-person neuropsychological evaluation of Mr. Rhodes on January 7 and 8, 2021.

52.    The results of the neuropsychological evaluation that IME Dr. Dahlman performed were objectively abnormal.

53.    IME Dr. Dahlman concluded that Mr. Rhodes' symptoms are "profoundly disabling."

54.    IME Dr. Dahlman's report states: "Testing confirms cognitive deficits including slowed processing speed, psychomotor slowing with defiant fine motor coordination in his non-dominant (right) hand, slow reading speed, poor reading comprehension, reduced math and executive skills, and poor attention and concentration."

55.    IME Dr. Dahlman's report states that Mr. Rhodes also developed depression, anxiety, and post-traumatic stress disorder ("PTSD") secondary to his head injury, which exacerbates his cognitive problems.

56.    In pertinent part, IME Dr. Dahlman's report states:

Mr. Rhodes has significant cognitive deficits caused by the traumatic brain injury he sustained on March 27, 2019.  He also suffers from depression, anxiety, and PTSD related to these problems.  He is struggling to maintain a normal family life with his wife, and has made multiple attempts to return to work but was unable to do so because of his fatigue, headaches, and cognitive symptoms.

57.    IME Dr. Dahlman's report states, "Now that two full years have passed since the injury, Mr. Rhodes cognitive impairments are likely to be _permanent_.  He is _completely disabled_ by his injuries in terms of his ability to return to work."  (Emphasis added).

58.    Mr. Rhodes also underwent a neuropsychological evaluation, performed by Jeffrey Sheer, M.D., on September 26, 2019, at the recommendation of Mr. Rhodes' treating provider.

59.    The results of the neuropsychological evaluation that Dr. Sheer performed were objectively abnormal.

8

60.    Dr. Sheer's neuropsychological evaluation revealed relative deficits in processing speed, working memory and attention, as well as rapid verbal fluency and adaptive reasoning.

61.    Dr. Sheer noted that secondary depression, anxiety, and ADHD may be contributing to Mr. Rhodes' dysfunction, but that Mr. Rhodes also suffers from "numerous physical complaints of headache, fatigue, dizziness, noise sensitivity, balance impairment, visual complaints, and physical discomfort which can also have a clear impact on these vulnerability cognitive abilities, even without actual injury to the brain."

62.    Dr. Sheer ultimately concluded that Mr. Rhodes' cognitive difficulties are likely secondary to his physical symptoms and that those should be the primary target of treatment.

<u>The Abnormal Clinical Findings Upon Examination</u>

63.    Mr. Rhodes' providers have found multiple clinical abnormalities upon examination.

64.    The clinical abnormalities that Mr. Rhodes' providers found upon examination of him correlate with both the physical and cognitive symptoms that he reports.

65.    The clinical abnormalities that Mr. Rhodes' providers noted upon examination of him include:

     a.    Depression of the left eye and scattered defects in the right eye;

     b.    Trace scattered defects, more in the left eye than the right eye;

     c.    Below average oculomotor ability with insufficient saccadic movements;

     d.    Convergence insufficiency;

     e.    Deficiency in visual perception;

     f.    Tender myofascial periscapular muscles bilaterally and positive upper cross sign;

     g.    Positive Fukuda test for vertigo and vestibular dysfunction, with deviations to the right;

     h.    Decreased functional mobility;

     i.    Deficits in delayed memory recall;

j.   Deficits in sequential memory;

k.   Deficits in visual figure-foreground and visual closure;

l.   Deficits in executive function; and

m.  Diminished attention and focus.

<u>Treating Providers</u>

66.    Mr. Rhodes has received care from a team of medical specialists in New York and in Massachusetts, including: (a) Teena Shetty, M.D., a neurologist at the Hospital for Special Surgery in New York City; (b) Seth Herman, M.D., a physical medicine and rehabilitation specialist at Spaulding Rehabilitation Hospital's Traumatic Brain Injury Program, in Boston; (c) Mel B. Glenn, M.D., a physical medicine and rehabilitation specialist with practices in New York and Boston; (d) Jeffrey Sheer, Ph.D, a neuropsychologist in Charlestown, MA; (e) Emilio Oribe, M.D, a neurologist in New York; (f) Anna Reuter, O.D., Traumatic Brain Injury Optometrist in New York; and (g) providers at PMGT Medical and Surgical Associates, LLP, in New York.

67.    None of Mr. Rhodes' treating providers concluded that he has been capable of resuming the duties of his Occupation or any other reasonable occupation since March 27, 2019.

68.    All treating providers that commented on Mr. Rhodes' degree of disability unanimously concluded that he is Totally Disabled.

<u>The Social Security Administration's Approval of Disability Benefits</u>

69.    Mr. Rhodes applied for Social Security Disability benefits.

70.    In a determination dated April 21, 2021, Social Security Administration ALJ Thurman Anderson found that Mr. Rhodes has been incapable of performing his own prior work, and any other substantial gainful activity in the national economy, since March 27, 2019.

71.    ALJ Anderson found Mr. Rhodes "is unable to perform any past relevant work" and that "considering the claimant's age, education, work experience, and residual functional capacity there are no jobs that exist in significant numbers in the national economy that claimant can perform."

72.    ALJ Anderson received testimony from Mr. Rhodes and an impartial vocational expert during a live hearing, in addition to reviewing the medical evidence.

73.    ALJ Anderson found that, "[T]he claimant's allegations are supported by the relevant medical evidence of record. . . . , which tends to corroborate his testimony."

74.    ALJ Anderson found that due to Mr. Rhodes' symptoms, he "would be absent from work three or more days each months, and requires eight breaks per day, each lasting twenty minutes."

75.    ALJ Anderson concluded that Mr. Rhodes only "retains the ability to perform simple, routine, repetitive tasks over a normal eight-hour workday, in a normal work environment with no more than simple decision-making" – noting a "mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing oneself."

76.    ALJ Anderson found an opinion offered by Mel B. Glenn, M.D., in 2020, to be particularly persuasive – specifically detailing that "Dr. Glenn provided extensive support for his opinion, noting that [Mr. Rhodes'] medications have not successfully alleviated his symptoms, that he continues to experience headaches on most days, including periodic exacerbations triggered by physical or cognitive activity, as well as vertigo/dizziness with nausea, and difficulty concentrating."

77.    Mr. Rhodes continues to receive Social Security Disability benefits to date.

## FIRST RELIANCE DENIED MR. RHODES' CLAIM FOR LONG TERM DISABILITY BENEFITS

78.    Mr. Rhodes applied to receive benefits from First Reliance under the LTD Plan.

79.    First Reliance considered, reviewed, and initially granted Mr. Rhodes' claim under the LTD Plan, finding that he satisfied the definition of Total Disability effective March 27, 2019.

80.     By notice dated November 17, 2020, First Reliance terminated Mr. Rhodes' benefits, finding that he no longer satisfied the applicable definition of Total Disability effective November 16, 2020.

81.     First Reliance's termination of Mr. Rhodes' benefits under the LTD Plan was unreasonable.

82.     First Reliance's termination of Mr. Rhodes' benefits under the LTD Plan was arbitrary and capricious.

83.     First Reliance's termination of Mr. Rhodes' benefits under the LTD Plan was unsupported by substantial evidence and contrary to the weight of the medical evidence.

84.     First Reliance's benefit termination notice, dated November 17, 2020, advised Mr. Rhodes that he had 180 days to file an administrative appeal, and that he could do so by submitting a written request in which he "should state any reasons why you feel this determination is incorrect, and should include any written comments, documents, records, or other information relating to your claim for benefits, including but not limited to any information submitted in conjunction with any claim for Social Security disability or other benefits which you would like us to consider."

## MR. RHODES FILED AN ADMINISTRATIVE APPEAL

85.     Mr. Rhodes filed a timely administrative appeal of First Reliance's denial of benefits under the LTD Plan, thereby exhausting administrative remedies available to him under the LTD Plan.

86.     Mr. Rhodes filed his appeal by letter dated March 2, 2021 ("March 2, 2021 Appeal").

87.     Mr. Rhodes' March 2, 2021 Appeal specified that it was "in response to the reasons for [First Reliance's] letter dated November 17, 2020."

88.     Mr. Rhodes' March 2, 2021 Appeal was 4-pages in length, refuting the points raised in the denial notice dated November 17, 2020 with direct arguments in response.

89.     Mr. Rhodes' March 2, 2021 Appeal attached new medical evidence and

correspondence in support of his claim.

90.     Mr. Rhodes' supplemented his March 2, 2021 Appeal by letter dated May 13, 2021, with which he submitted additional new evidence, including: (a) a neuropsychological independent medical evaluation from Dr. Dahlman, dated March 10, 2021; and (b) a copy of ALJ Thurman's fully favorable decision, dated April 21, 2021, awarding Social Security Disability benefits to Mr. Rhodes.

## FIRST RELIANCE UPHELD ITS INITIAL DENIAL ON APPEAL

91.     By letter dated January 7, 2022, First Reliance made a final determination to uphold its denial of benefits on review.

92.     First Reliance's final determination and denial of Mr. Rhodes' benefits on review was unreasonable.

93.     First Reliance's final determination and denial of Mr. Rhodes' benefits on review was arbitrary and capricious.

94.     First Reliance's final determination and denial of Mr. Rhodes' claim under the LTD Plan was unsupported by substantial evidence and contrary to the weight of the medical evidence.

95.     As detailed below, First Reliance's appeal process and final benefit determination was untimely, deeply flawed, and riddled with violations of ERISA's claims procedure regulations.

## FIRST RELIANCE'S FINAL DETERMINATION WAS UNTIMELY IN VIOLATION OF ERISA'S CLAIMS PROCEDURE REGULATIONS

96.     First Reliance's failed to render a final determination on appeal review within the deadlines set forth at ERISA's claims procedure regulations at 29 C.F.R. §2560.503-1(i)(3)(i) and 29 C.F.R. §2560.503-1(i)(1)(i).

97.     First Reliance's denial notice dated November 17, 2020 specifically informed Mr. Rhodes that First Reliance would make an appeal determination within 45 days of receipt of the appeal, and that First Reliance may take up to a total of 90 days to render a determination on appeal if "special circumstances require an extension of time for processing."

13

98.     Although Mr. Rhodes filed his appeal on March 2, 2021, First Reliance did not render a final determination on appeal until January 7, 2022 – <u>311 days later</u>.

99.     First Reliance rendered its final determination on appeal, dated January 7, 2022, <u>239 days</u> after Mr. Rhodes' subsequent appeal submission of supplementary evidence, dated May 13, 2021.

100.    No special circumstances existed to justify First Reliance's delay in rendering a final benefit determination on review.

101.    Even if special circumstances existed to justify First Reliance's delay in the final benefit determination on review, First Reliance nonetheless violated ERISA's claim procedure regulations because it exceeded the 90-day maximum period permitted under the regulations.

**FIRST RELIANCE USED ITS UNLAWFUL DELAY ON APPEAL REVIEW
TO OBTAIN AN EXTRA-RECORD MEDICAL EVALUATION AND ADDENDUM**

102.    First Reliance took the opportunity created by its unlawful delay on appeal to obtain a so-called "independent" neuropsychological evaluation and addendum by Kristjan Olafsson, Ph.D.

103.    First Reliance first demanded that Mr. Rhodes submit to a neuropsychological evaluation by Dr. Olafsson on July 16, 2021 – a date which is <u>beyond</u> the initial 45-days that First Reliance had to render a final determination on appeal.

104.    First Reliance did not notify Mr. Rhodes in writing of any special circumstances warranting First Reliance's delay in demanding and obtaining Dr. Olafsson's evaluation.

105.    No special circumstances existed to warrant First Reliance's delay in demanding and obtaining Dr. Olafsson's evaluation.

106.    First Reliance sat on Mr. Rhodes' appeal for <u>weeks</u> before even referring the file for an evaluation by Dr. Olafsson.

107.    It was completely within First Reliance's control to refer Mr. Rhodes' file for a neuropsychological evaluation earlier while on appeal.

108.    It is routine for claim administrators, such as First Reliance, to consult with a medical

professional on every disability appeal that it receives.

109.    Dr. Olafsson eventually completed his evaluation on July 27, 2021.

110.    First Reliance received Dr. Olafsson's report on August 6, 2021.

111.    First Reliance also received an addendum from Dr. Olaffson, dated December 22, 2021.

112.    Dr. Olafsson's report and addendum should be excluded from the record because they were obtained _after_ First Reliance's deadline to render a final benefit determination on appeal had already expired.

## FIRST RELIANCE'S FINAL DETERMINATION FAILED TO PROVIDE A FULL AND FAIR REVIEW

113.    First Reliance failed to provide a full and fair review of Mr. Rhodes' claim because First Reliance failed to strictly adhere to all the requirements of ERISA's claims procedure regulations at 29 C.F.R. §2560.503-1(h)(4).

114.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4), was not _de minimis_.

115.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4), was not for good cause.

116.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4), was not due to matters beyond the control of First Reliance.

117.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4), was not in the context of an ongoing, good faith exchange of information between First Reliance and Mr. Rhodes.

118.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4), caused, and is likely to cause prejudice or harm to Mr. Rhodes.

119.    First Reliance's failure to provide a full and fair review adversely affected the

development of the administrative record.

120.    Upon information and belief, First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4), was part of a pattern or practice of violations by First Reliance.

**FIRST RELIANCE VIOLATED ERISA'S REGULATIONS
BY NOT PROVIDING A TIMELY OPPORTUNITY
TO RESPOND TO DR. OLAFSSON'S INITIAL REPORT**

121.    In violation of 29 C.F.R. §2560.503-1(h)(4)(ii), First Reliance failed to provide Mr. Rhodes an opportunity to respond to all of First Reliance's new or additional evidence considered, relied upon, or generated on appeal <u>sufficiently in advance</u> of the deadline to issue a benefit determination on appeal, and by failing to give Mr. Rhodes a reasonable opportunity to respond prior to such deadline.

122.    Dr. Olafsson's initial report, dated July 27, 2021, was new evidence that First Reliance considered and relied upon on appeal.

123.    First Reliance did not provide Mr. Rhodes an opportunity to respond to Dr. Olafsson's initial report within the deadlines that ERISA prescribes to render a final benefit determination on appeal.

124.    First Reliance did not give a copy of Dr. Olafsson's initial report to Mr. Rhodes until August 21, 2021.

125.    August 21, 2021 was beyond the first 45 days and maximum 90 days in which First Reliance was permitted to make a final determination.

126.    After First Reliance <u>finally</u> provided a copy of Dr. Olafsson's report to Mr. Rhodes, First Reliance caused further delays by failing to facilitate Mr. Rhodes' reasonable requests for the raw evaluation data (necessary for Mr. Rhodes to respond) in a timely manner.

127.    First Reliance did not get Dr. Olafsson's raw data sent to Mr. Rhodes' treating

16

providers for comment until November 5, 2021.

128.    Dr. Olafsson's initial report, dated July 27, 2021, should be excluded from the record because First Reliance failed to provide a timely opportunity to respond to it.

**FIRST RELIANCE VIOLATED ERISA'S REGULATIONS**
**BY NOT PROVIDING ANY OPPORTUNITY**
**TO RESPOND TO DR. OLAFSSON'S ADDENDUM REPORT**

129.    In violation of 29 C.F.R. §2560.503-1(h)(4)(ii), First Reliance provided <u>no opportunity</u> – let alone a timely one – to respond to an addendum that First Reliance obtained from Dr. Olaffson, dated December 22, 2021, on appeal.

130.    Dr. Olaffson's addendum, dated December 22, 2021, contained new medical rational regarding Mr. Rhodes' claim on appeal.

131.    First Reliance never gave Mr. Rhodes <u>any</u> opportunity to review or respond to Olaffson's addendum, dated December 22, 2021, prior to rendering the final benefit determination.

132.    First Reliance only gave a copy of Dr. Olaffson's addendum, dated December 22, 2021 – <u>after</u> rendering the final benefit determination.

133.    Dr. Olaffson's addendum, dated December 22, 2021, should be excluded from the record because of First Reliance's handling and production of this evidence during the administrative process without providing Mr. Rhodes any opportunity to respond to it.

**FIRST RELIANCE VIOLATED ERISA'S REGULATIONS**
**BY FAILING TO CONSULT WITH**
**AN APPROPRIATELY QUALIFIED MEDICAL PROFESSIONAL**

134.    First Reliance failed to strictly adhere to all the requirements of 29 C.F.R. §2560.503-1(h)(4)(iii), when it failed to consult with an appropriately qualified medical professional about Mr. Rhodes' appeal evidence on review.

135.    First Reliance failed to provide a full and fair review of Mr. Rhodes' claim because First Reliance failed to strictly adhere to all the requirements of ERISA's claims procedure regulations

at 29 C.F.R. §2560.503-1(h)(4)(iii).

136.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4)(iii), was not *de minimis*.

137.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4)(iii), was not for good cause.

138.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4)(iii), was not due to matters beyond the control of First Reliance.

139.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4)(iii), was not in the context of an ongoing, good faith exchange of information between First Reliance and Mr. Rhodes.

140.    First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4)(iii), caused, and is likely to cause prejudice or harm to Mr. Rhodes.

141.    First Reliance's failure to provide a full and fair review adversely affected the development of the administrative record.

142.    Upon information and belief, First Reliance's failure to strictly adhere to the requirements of 29 C.F.R. §2560.503-1(h)(4)(iii), was part of a pattern or practice of violations by First Reliance.

143.    Although Mr. Rhodes submitted substantial new treatment notes from his neurologist, ophthalmologist, and other medical providers treating Mr. Rhodes' physical symptoms, First Reliance only consulted with a psychologist, Dr. Olafsson, about this new evidence.

144.    As a psychologist, Dr. Olafsson was not appropriately qualified to review neurological records, ophthalmology records, and other medical evidence relating to Mr. Rhodes' physical symptoms.

## FIRST RELIANCE VIOLATED ERISA'S REGULATIONS
## BY FAILING TO PROVIDE AN IMPARTIAL REVIEW

145.    In violation of 29 C.F.R. §2560.503-1(b)(7), First Reliance failed to ensure the impartiality of the consultants that it used to review Mr. Rhodes' claim.

146.    Dr. Olafsson, the examining psychologist that First Reliance used, and the non-examining medical reviewers and vocational consultants that First Reliance used in Mr. Rhodes' case (together, "First Reliance's examiners and consultants") are not impartial.

147.    Upon information and belief, First Reliance's examiners and consultants are either in-house employees of First Reliance or independent contractors hired and/or retained directly by First Reliance, either directly or through a third-party vendor.

148.    Upon information and belief, First Reliance's examiners and consultants have produced many reports in connection with other individuals whose claims are administered by First Reliance.

149.    First Reliance knows, or has reason to know, that First Reliance's examiners and consultants only act in the interests of insurance companies and never individual claimants.

150.    Upon information and belief, First Reliance pays substantial sums of money to its examiners and consultants, whether in-house or independent contractors, or hired through third-party vendors, to make conclusions about First Reliance's insureds.

151.    Because First Reliance's examiners and consultants, and the third-party vendors that first Reliance contracts with to hire examiners and consultants, derive substantial income from performing file reviews and examinations for First Reliance insureds, they have an incentive to provide conclusions that First Reliance deems favorable in order to perform future work for First Reliance.

## FIRST RELIANCE VIOLATED ERISA'S REGULATONS
## BY FAILING TO PROVIDE A COPY OF THE CLAIM FILE

152.    Upon information and belief, First Reliance unlawfully provided a substantially incomplete copy of the claim file to Mr. Rhodes' counsel, Riemer Hess, upon written request, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iii) and 29 C.F.R. § 2560.503-1(i)(5).

153.    Upon information and belief, in providing a copy of the claim file to Riemer Hess (the "Claim File"), First Reliance omitted relevant information, documents, and correspondence that is material to Mr. Rhodes' claim.

154.    Upon information and belief, First Reliance omitted information from the Claim File that demonstrates First Reliance's conflict of interest and the impact of its conflict on Mr. Rhodes' claim.

155.    Upon information and belief, First Reliance used a third-party vendor, Network Medical Review Co. Ltd. ("NMR"), to obtain the neuropsychological medical examination and reports of Dr. Olafsson.

156.    Upon information and belief, First Reliance uses NMR for many of First Reliance's disability claims and appeals.

157.    Upon information and belief, NMR derives substantial income from work performed on behalf of First Reliance.

158.    Upon information and belief, NMR has an incentive to provide opinions to First Reliance that do not support a finding of disability.

159.    Upon information and belief, NMR allowed the incentive to provide opinions that do not support a finding of disability to affect its actions and Dr. Olafsson's opinions.

160.    Upon information and belief, NMR initially flagged the addendum prepared by its examiner, Dr. Olafsson, as having so-called "quality assurance" issues.

161.    Upon information and belief, NMR requested that Dr. Olafsson's addendum be revised to address the "quality assurance" issues that NMR flagged.

162.    Upon information and belief, NMR requested revision of Dr. Olafsson's addendum because it contained information that was supportive of Mr. Rhodes' claim.

163.    Upon information and belief, the Claim File contains neither the original, un-revised addendum by Dr. Olaffson, nor any correspondence or information relating to revisions of the addendum or quality assurance issues.

164.    Upon information and belief, First Reliance also omitted email correspondence to Mr. Rhodes and Union Bank from the Claim File.

165.    Upon information and belief, First Reliance also omitted information regarding Mr. Rhodes' occupational duties from the Claim File.

## FIRST RELIANCE'S EVIDENCE IS FLAWED AND UNRELIABLE

166.    First Reliance's denial of Mr. Rhodes' benefits under the LTD Plan was incorrect, against the weight of the evidence, unreasonable, unlawful, contrary to the terms of the LTD Plan, unsupported by substantial evidence, and arbitrary and capricious.

167.    First Reliance issued a benefit determination without obtaining or requesting any relevant information about the demands of his Occupation.

168.    First Reliance neither obtained nor requested a job description, a report from Mr. Rhodes, or a report from Mr. Rhodes' employer about the demands of Mr. Rhodes' Occupation.

169.    First Reliance did not even get the title or classification of Mr. Rhodes' Occupation correct, let alone correctly identify the demands of Mr. Rhodes' Occupation.

170.    First Reliance erroneously terminated Mr. Rhodes' benefits based on the unreliable and unsupported opinions of its medical and vocational consultants and examiners.

171.    In denying Mr. Rhodes' appeal, First Reliance relied almost exclusively on the report

and addendum of Dr. Olafsson.

172. Dr. Olafsson's conclusions are inconsistent with the other evidence in the record, detailed above in paragraphs 1 through 76.

173. Dr. Olafsson's conclusion that Mr. Rhodes has no deficits, restrictions, or limitations is unreliable.

174. Dr. Olafsson's report is unreliable because:

a. His opinion is infected by conflict and bias;

b. His conclusions lack foundation and are conclusory;

c. He offered conclusions that were directly contradicted by the evidence;

d. He failed to conduct all relevant clinical testing;

e. He failed to consider the nature of Mr. Rhodes' conditions and the lack of significant improvement;

f. He lacked appropriate qualifications to comment on Mr. Rhodes' physical conditions, symptoms, and the diagnostic testing;

g. He downplayed, mischaracterized, and even ignored Mr. Rhodes' diagnostic testing results and clinical abnormalities;

h. He dismissed Mr. Rhodes' credible subjective complaints without explanation;

i. He failed to consider all relevant information, including Mr. Rhodes' relevant Regular Occupational demands;

j. His conclusions were inconsistent with the weight of the evidence;

k. His report and addendum selectively reviewed and cherry-picked the evidence; and

l. His report and addendum are riddled with internal inconsistencies that undermine the reliability of his conclusions.

175. Prior to the appeal, First Reliance also had Mr. Rhodes' file reviewed by non-

examining medical reviewers and other consultants.

176.    The opinions of First Reliance's non-examining reviewers and consultants are unreliable, unsupported by substantial evidence, conclusory, and contrary to the evidence.

177.    The reports of First Reliance's non-examining reviewers and consultants are unreliable because:

a.    They never examined Mr. Rhodes in-person, which is particularly relevant, given the complexity of Mr. Rhodes' conditions and the presence of examining reports;

b.    Their opinions are infected by conflict and bias;

c.    Their conclusions lack foundation and are conclusory;

d.    They offered conclusions that were directly contradicted by the evidence;

e.    They failed to consider the nature of Mr. Rhodes' conditions;

f.    They lacked appropriate qualifications;

g.    They downplayed, mischaracterized, and even ignored Mr. Rhodes' diagnostic testing results and clinical abnormalities;

h.    They dismissed Mr. Rhodes' credible subjective complaints without explanation;

i.    They failed to consider all relevant information, including Mr. Rhodes' relevant occupational demands;

j.    Their conclusions were inconsistent with the weight of the evidence;

k.    They selectively reviewed and cherry-picked the evidence; and

l.    Their reports are riddled with internal inconsistencies that undermine the reliability of their conclusions.

## COUNT I (The LTD Plan)

178.    Mr. Rhodes repeats and re-alleges the allegations set forth in paragraphs 1 through 177 above.

179.    First Reliance had no legal basis for terminating Mr. Rhodes's benefits under the LTD Plan.

180.    Under the terms of the LTD Plan, First Reliance agreed to provide Mr. Rhodes with certain benefits under such plan, in accordance with the terms and conditions set forth therein.

181.    To date, First Reliance has failed and refused to provide Mr. Rhodes the benefits under the LTD Plan to which he is rightfully entitled, from November 17, 2020 through the present date.

182.    Mr. Rhodes has satisfied all conditions precedent under the LTD Plan and is thus eligible to receive benefits beyond November 16, 2020.

183.    First Reliance's determination that Mr. Rhodes is not Totally Disabled within the meaning of the LTD Plan is contrary to the terms of the LTD Plan, and contrary to the evidence.

184.    First Reliance has financial conflicts of interest with respect to handling, monitoring, and eventually denying Mr. Rhodes's benefits under the LTD Plan.

185.    First Reliance was influenced by its financial conflict of interest, as both the administrator of the LTD Plan and the payor of benefits thereunder, when deciding to deny benefits.

186.    First Reliance's was influenced by its financial conflict of interest, as supported by categorical evidence in the form of judicial decisions reviewing First Reliance's benefits decisions finding that First Reliance acted arbitrarily and capriciously, including the following:

     a.    *Okuno v. Reliance Std. Life Ins. Co.*, 836 F.3d 600 (6th Cir. 2016);

     b.    *Lasser v. Reliance Std. Life Ins. Co.*, 344 F.3d 381 (3rd Cir. 2003);

     c.    *O'Bryhim v. Reliance Std. Life Ins. Co.*, 1999 U.S. App. LEXIS 19232 (4th Cir. 1999);

    d.  *Patrick v. Reliance Std. Life Ins. Co.*, 2021 U.S. Dist. LEXIS 241151 (D. Del. Dec. 17, 2021);

    e.  *Connelly v. Reliance Std. Life Ins. Co.*, 2014 U.S. Dist. LEXIS 74632 (E.D. Pa. June 2, 2014).

    f.  *Dzidzovic v. Bldg. Serv. 32B-J Health Fund*, 2006 U.S. Dist. LEXIS 55546 (S.D.N.Y. Aug. 7, 2006);

    g.  *Badawy v. First Reliance Std. Life Ins. Co.*, 2005 U.S. Dist. LEXIS 21868 (S.D.N.Y. Sept. 28, 2005);

    h.  *Freling v. Reliance Std. Life Ins. Co.*, 315 F. Supp. 2d 1277 (M.D. Fl. 2004); and

    i.  *McGuigan v. Reliance Std. Life Ins. Co.*, 2003 U.S. Dist. LEXIS 17593 (E.D. Pa Oct. 6, 2003).

187.  The unlawful behavior of First Reliance is evidenced by the following:

    a.  Denying benefit payments to Mr. Rhodes when First Reliance knew that he was entitled to said benefits, in bad faith and contrary to the LTD Plan;

    b.  Unreasonably denying and withholding payments from Mr. Rhodes knowing his claim for benefits was valid;

    c.  Exceeding the deadlines prescribed by ERISA to render a final determination on appeal;

    d.  Engaging in a pattern of delay and avoidance of Mr. Rhodes's legitimate claim, during which First Reliance surpassed its 45-day deadline to issue a decision in response to Mr. Rhodes's appeal, in violation of 29 C.F.R. §2560.503-1(i);

    e.  Engaging in a pattern of delay and avoidance of Mr. Rhodes's legitimate claim, during which First Reliance surpassed its maximum 90-day deadline to issue a decision in response to Mr. Rhodes's appeal, in violation of 29 C.F.R. §2560.503-1(i); and

    f.  Gathering and stacking new evidence against Mr. Rhodes when the deadlines to render a final adverse determination had already expired;

    g.  Failing to provide Mr. Rhodes a meaningful opportunity to review and respond to new

reports and information that First Reliance obtained on appeal;

h.  Failing to ensure the impartiality of the consultants that First Reliance used to review Mr. Rhodes' claim;

i.  Ignoring and mischaracterizing diagnostic testing demonstrating objective abnormalities relating to Mr. Rhodes's condition and symptoms;

j.  Ignoring Mr. Rhodes's treating providers' assessments of his medical conditions, and how they restrict and limit him from performing his Regular Occupation, without any basis for doing so in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

k.  Relying on non-examining and underqualified medical consultants to deny a claim supported by objective medical evidence;

l.  Relying on the opinion of a one-time medical examiner whose report was riddled with errors, omissions, and conclusory statements;

m.  Failing to consult with an examining healthcare professional who has appropriate training and experience to comment on Mr. Rhodes's physical conditions and symptoms, in violation of 29 C.F.R. § 2560.503(h)(3);

n.  Disregarding Mr. Rhodes's subjective complaints, his own assessment of his medical conditions, and how they restrict and limit him from performing his Regular Occupation, in violation of 29 C.F.R. §2560.503-1(h)(2)(iv);

o.  Engaging in a pattern of procedural irregularities to advance its own corporate interests in denying benefits, to the detriment of LTD Plan participants;

p.  Failing to provide a complete copy of the claim file containing all relevant documents and information to Mr. Rhodes' counsel upon written request;

q.  Failing to provide a "full and fair review" as First Reliance was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4);

r.   Failing to provide Mr. Rhodes with an adequate description of any additional material or information necessary to perfect his claim in violation of 29 C.F.R. §2560.503-1(g)(1)(iii);

s.   Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

t.   Failing to follow its own internal claims administration policies and procedures;

u.   Rendering a benefits determination without having any relevant information about the claimant's occupational demands;

v.   Consistently acting in its own corporate interests instead of those of the LTD Plan and its participants;

w.   Failing to give adequate weight to the Social Security Administration's decision;

x.   Failing to provide an adequate explanation of why First Reliance disagreed with the decision of the Social Security Administration; and

y.   Engaging in unlawful behavior and violations of ERISA's procedural regulations that were purposeful and harmful to Mr. Rhodes.

188.    Mr. Rhodes has been forced to bring the instant action as a direct result of First Reliance's unlawful benefit denial and violations of the LTD Plan and ERISA.

189.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Mr. Rhodes is entitled to recover disability benefits under the LTD Plan that have not been paid to date, with interest, and those that will become due in the future.

190.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Mr. Rhodes is entitled to recover waiver of premium benefits under the LTD Plan that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II (Attorney Fees and Costs)

191.    Mr. Rhodes repeats and re-alleges the allegations set forth in paragraphs 1 through 190 above.

192.    By reason of LTD Plan's failure to pay Mr. Rhodes disability and waiver of premium benefits due under the terms of such plan, Mr. Rhodes has been forced to retain attorneys to recover such benefits, for which he has and will continue to incur attorneys' fees.

193.    Mr. Rhodes is entitled to recover reasonable attorneys' fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Mr. Rhodes demands judgment against First Reliance:

A.    For the amount of all long term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

B.    Clarifying and declaring that the LTD Plan is obligated to pay Mr. Rhodes long term disability benefits in the future as required by the LTD Plan;

C.    For the amount of all waiver of premium benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

D.    For the costs of this action and Mr. Rhodes's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(1); and

E.    For such other and further relief as may be deemed just and proper by the Court.

Dated: New York, New York
       June 22, 2022

By:    /s/ Jennifer Hess
       Jennifer Hess (JS 3684)
       RIEMER HESS LLC
       Attorneys for Plaintiff
       275 Madison Avenue, 26th Floor
       New York, New York 10016
       (212) 297-0700
       jhess@riemerhess.com